Vivian LEONARD, Administratrix of the Estate of John Leonard, Deceased, Bruce Love and Phyllis Love, Plaintiffs-Appellees.

v.

UNIROYAL, INC., Defendant-Appellant.

No. 84-5507.

United States Court of Appeals, Sixth Circuit.

Argued April 18, 1985.

Decided June 11, 1985.

Gregory K. Jenkins (Lead) argued, Ronald L. Green, Boehl, Stopher, Graves & Deindoerfer, Lexington, Ky., for defendant-appellant.

Peter Perlman (Lead) argued, Perlman and Garmer, Lexington, Ky., R. Jackson Rose, Tazewell, Tenn., for plaintiffs-appellees.

Before KENNEDY and MILBURN, Circuit Judges, and GUY, District Judge.[*]

CORNELIA G. KENNEDY, Circuit Judge.

This is a products liability case. On June 15, 1981, John Leonard, plaintiff-appellee's decedent, was killed, and plaintiff-appellee Bruce Love, was injured, when the left front tire of their truck blew out and the truck swerved off the highway and into an embankment. Plaintiffs brought suit in federal district court against Uniroyal on the basis of diversity of citizenship, alleging that the blowout was caused by a manufacturing defect in the tire. Kentucky law is applicable. A jury trial resulted in a judgment in favor of the plaintiffs in the amount of $221,448.33.

## I.

The following facts brought out at trial are basically undisputed. The tire in question was a bias belted tire. It had been operated between 35,000 and 40,000 miles. The tread was worn more heavily in the center than on the shoulders of the tire. Neither shoulder was more worn than the other. Such a wear pattern indicates that the tire was operated consistently in an

[*] Honorable Ralph B. Guy, Jr., United States District Court for the Eastern District of Michigan, sitting by designation.

overinflated condition. A properly vulcanized tire would have hardness readings uniformly in excess of 60 as measured by a durometer, a hand-held instrument used to measure the hardness of rubber. Leonard and Love were employed as truck drivers by Giles Industries in Tazewell, Tennessee, and shared trips once or twice a week. Prior to the trip in question, Leonard and James Giles, his employer, inspected the truck's tires. They agreed that the right front tire should be replaced, but that the left front, the tire in question, was satisfactory.

The disputed evidence at trial pertained to the cause of the tire's blowout. Plaintiffs presented the testimony of two experts employed by the consulting engineering firm of Cerny and Ivy—Ralph Cunningham and John Cerny. Cunningham was an engineer-in-training, a designation under Georgia law indicating that an individual has passed the first of two state examinations prerequisite to licensure as an engineer; Cerny was an engineer. Although both indicated that they were familiar with the processes by which tires are manufactured and had performed several hundred evaluations of failed tires during their careers, neither had educational background in rubber and polymer science or had observed the manufacture of tires first-hand.

Cunningham, who performed the initial evaluation of the tire, testified that "[l]ack of proper vulcanization ... led to improper adhesion of the ... internal components of the tire. That eventually resulted in the separation [of the tread plies from the tread gap], which resulted in the heat build up, which resulted in the tire cords melting, which resulted in the blow-out." He testified that an "x-break" pattern in the tire cords, and the brittleness of the cord ends in the area of the blowout indicative of localized heating effects, were consistent with his evaluation, and inconsistent with failure due to underinflated operation, which would be evidenced by generalized heating effects. He also supported his conclusion with durometer test results, testifying that he obtained durometer readings ranging from over 60 on the non-serial side of the tire to a low of 32 on the serial side of the tire, the side on which the blowout occurred.

On cross-examination, Cunningham was asked to repeat his durometer tests on the tire. Using the same durometer, he obtained results uniformly in excess of 60. He insisted, however, that he did not err in his initial results, describing the steps that he routinely performed to check the calibration of his durometer and ensure the accuracy of his readings. Rather, he suggested that some alteration had taken place in the tire between the time that he tested it and the trial. Cerny testified that he had inspected the tire after Cunningham, had obtained the same durometer readings, and concurred in Cunningham's analysis of the cause of the blowout.

Testifying as an expert for Uniroyal was Richard Harrison, its manager of tire reliability. Harrison testified that since vulcanization occurs in a closed pressure vessel, the non-uniform durometer readings allegedly obtained by Cunningham and Cerny were physically impossible. Moreover, he contended that a tire with durometer readings in the thirties would be noticeably soft and if operated would separate quickly. He concluded that although the tire wear pattern indicated prolonged use overinflated, the evidence of heat buildup and loosened cords indicated that underinflated operation immediately prior to the blowout was its cause.

Harrison was also called as a witness by plaintiffs during presentation of their case in chief. When asked whether he was "an expert in terms of the chemical compositions of rubber once it's heated to the final vulcanized state," he conceded that "I am not an expert. I am not a compounder." He agreed that if it is impossible to eliminate or minimize the risk of injury from a product, it is proper safety practice to guard against those risks, and that if it is not possible to guard against them, to furnish adequate warnings. He testified that there was some softness around the circumference of the serial side of the tire,

which he attributed to degradation due to excessive heat generated by underinflated operation, although he testified as a defense witness that he had obtained durometer readings uniformly in excess of 60 when he tested the tire prior to trial; and that overinflation will cause excessive tread wear in the center of the tire but could not have caused the blowout in this case. He also made clear both on plaintiffs' direct and cross examination that Uniroyal "know[s] for a fact that people drive trucks and cars in an underinflated condition." In conjunction with his testimony on underinflation, he confirmed documents establishing that by 1972, the need for a low pressure warning device had become known and recognized by Uniroyal, and "we have been constantly trying to make such an item, or consider it." Finally, he conceded that bias ply tires of the type involved herein have been returned to Uniroyal by dealers for adjustment because of "separation developments," referred to by Love as "nuts," which are partial separations of the tire plies.

In response to Uniroyal's contention that the blowout was caused by operation while the tire was underinflated, plaintiffs argued that Uniroyal was negligent in failing to warn of the danger of underinflation. On appeal, Uniroyal contends that the trial judge erred in refusing to instruct the jury that Uniroyal had no duty to warn about underinflation if this danger was obvious to the users of the product in question. It also contends that the trial judge erred in refusing its motion for a directed verdict since there was insufficient evidence to support a jury finding that the tire was defective; that Uniroyal was prejudiced by the court excluding as evidence rubber plugs manufactured by it during the course of trial to hardnesses of 39 and 65; that there was no evidence showing that a warning about underinflation would have altered the conduct of John Leonard or Bruce Love; that the drivers' contributory negligence barred recovery; that the court erred in giving both strict liability and negligence instructions; and that the court erred in giving design defect and duty to warn instructions since these theories were not plead by the plaintiffs.

## II.

Appellant contends that the trial judge erred in failing to instruct the jury that Uniroyal had no duty to warn about underinflation if this danger was obvious to the users of the product in question. The core of the trial judge's instructions to the jury was as follows:

Instruction No. 1. The Jury will find for the plaintiff, Vivian Leonard, Administratrix; Bruce Love; and Phyllis Love, if you believe from the evidence: (a) That the defendant, Uniroyal, Inc., designed, manufactured, marketed, and distributed the tire in question. (b) That said tire as manufactured was in a defective condition, and unreasonably dangerous to the user at the time of its manufacture. A product is in a defective condition unreasonably dangerous to the user if the product, as designed or manufactured, created such a risk of injury that an ordinary prudent company engaged in the manufacture of tires, being fully aware of the risk, would not have put it on the market. (c) That such defect was a substantial factor in causing the injuries sustained by Bruce Love, and the injuries and death of John Leonard. Unless you so believe, you will find for the defendant.

Instruction No. 2. You are further instructed that it was the duty of the decedent, John Leonard, and the plaintiff, Bruce Love, to keep the tire in question inflated; and if you believe that said parties, or either of them, drove said tire in an under-inflated condition and that such under-inflation was a substantial factor in causing the blowout of said tire, then you will find for the defendant, Uniroyal, Inc.; unless you believe from the evidence that the defendant, Uniroyal, Inc., failed to give adequate warning of the danger resulting from under-inflation as set out in Instruction No. 3.

Instruction No. 3. It was the duty of the defendant, Uniroyal, Inc., to give to John

Leonard, and to Bruce Love, such warning or warnings as would bring to their attention fair and adequate notice of any and all dangers that Uniroyal, Inc., could reasonably foresee which might arise from the use or even misuse of the tire in question, including under-inflation. If you find that the defendant, Uniroyal, Inc., failed to comply with any one or more of these duties and that such failure was a substantial factor in causing the injuries sustained by Bruce Love, and the injuries and death of John Leonard, you will find for the plaintiffs. Otherwise, you will find for the defendant. Instruction No. 4. It is the duty of the defendant, Uniroyal, Inc., to exercise reasonable judgment in the manufacture, design, sale, and distribution of the tire in question. If the jury believes that Uniroyal, Inc., failed to exercise reasonable care, and that such failure was a substantial factor in causing the injuries of John Leonard and Bruce Love, then the Jury shall find for the plaintiffs ....

There was no warning on the tire of the danger of operation while underinflated. The only information on the tire pertaining to inflation was maximum tire pressures listed for specific load weights. *See Post v. American Cleaning Equipment Corp.*, 437 S.W.2d 516, 520 (Ky.1968) (instructions for use do not warn user of danger associated with misuse); *accord Wolfe v. Ford Motor Co.*, 6 Mass.App. 346, 376 N.E.2d 143, 146 (1978) ("[T]he 'Recommended Inflation Pressures' given in the manual were not presented as safety measures, the disregard of which, when coupled with overloading, could result in a serious accident." (footnote omitted)).

Uniroyal, however, contends that whether an adequate warning was given was not an issue in the case. In fact, it conceded at oral argument that if it had a duty to warn of the danger of underinflation, it had failed to do so. Rather, it argues that its theory was that it had no duty to warn since the danger of underinflated operation was common knowledge to users of its product—professional truck drivers.[1] *Cf. Wolfe*, 376 N.E.2d at 146 ("[T]here is an obvious likelihood of overloading a camper with equipment and passengers *by users who have had little or no experience in handling trucks*, and this may require a more pointed warning than might otherwise be necessary." (emphasis added)). It argues that whether there is a duty to warn is a jury question, and reasons that, in instructing the jury that Uniroyal had a duty to warn of underinflation, the trial judge effectively directed a verdict for the plaintiffs.[2]

---

1. In its brief, Uniroyal states that the testimony of Bruce Love establishes that "[t]ruck drivers know the importance of tires and inspection thereof and the seriousness of the specific risk created by the failure to maintain same. Truck drivers know to maintain correct tire pressure. Tl 38." In fact, the cited testimony does not establish that Love was aware of the risk of a blowout caused by underinflated operation, nor that he understood how to maintain and vary proper tire pressure commensurate with the load being carried.

Q. You depend on your tires all the time, don't you?
A. Yes, sir.
Q. And you inspect them regularly?
A. Yes, sir.
....
Q. Do you check how much they're inflated? If they're too high or too low?
A. Maybe after a couple weeks I do.
Q. Okay. It's important to keep a check on how much air is in the tire, though, isn't it?

What do you generally put in a front tire on your truck?
A. On my Ford? About 75 pound.

Moreover, although Love testified that Leonard was responsible for checking the equipment, including the tires, on the trip in question, and that he assumed that Leonard had done so, it is undisputed that Leonard and Giles inspected the tires before the trip began. In *Rome v. Kelly Springfield Tire Co.*, 217 Va. 943, 234 S.E.2d 277 (1977), the court, noting plaintiff's testimony that he checked the air pressure in his tires weekly and inspected them visually daily, observed that "[t]he clear inference from his evidence is that Pennington would have observed an under-inflated tire upon visual inspection...." 234 S.E.2d at 280.

2. Uniroyal's argument presumes that the only possibilities were that the tire blew out either because it was defectively manufactured or was run underinflated. Another possibility, however, was that the tire failed due neither to defect nor underinflation, but as the result of

A similar argument was made by Uniroyal in *Gisriel v. Uniroyal, Inc.*, 517 F.2d 699 (8th Cir.1975). The plaintiff in *Gisriel* sought damages from the manufacturer and installer of a truck tire that blew out shortly after being purchased, resulting in an accident and the death of plaintiff's decedent. One of plaintiff's theories was that Uniroyal had failed to accompany the tire with proper mounting instructions and warnings. The trial court instructed the jury as follows on this issue:

> If you find from the evidence that Uniroyal, as the manufacturer of the flap, knew that it was essential that certain procedures in the mounting of truck tires requiring the use of the flap be employed and that failure to use such procedures might cause failure of the flap, it was the duty of Uniroyal to issue adequate instructions as to the mounting procedure and adequate warning of the danger of not following such procedures.

517 F.2d at 703. Uniroyal contended that "this instruction erroneously failed to inform the jury that a manufacturer only has a duty to warn of the existence of an unknown danger or one not reasonably discoverable ... [and] that, because the improper mounting procedures employed by the Quinn-Moore attendants were fraught with dangers about which the attendants should have known, Uniroyal is not chargeable with negligence in failing to warn of such dangers." *Id.*

█ The court concluded that it is well settled that a court has no duty to instruct on matters about which no evidence has been presented, *id.;* that "when a manufacturer claims, as an exception to his duty to warn, the knowledge of the user," the burden is on the manufacturer to offer evidence that the danger was or should have been obvious, *id.* at 704; and that "there was no prejudicial error in the failure of the District Court to instruct the jury that no duty to warn arises when the danger of the product is known to the user or is reasonably discoverable by him, since there was no evidence in the record upon which to predicate such actual or discoverable knowledge." *Id.* (footnote omitted).[3] Applying the court's holding to the instant case, no evidence whatsoever was introduced by the defendant in its case in chief

some intervening cause during its operation, such as heavy impact with a pothole, curb or sharp object, combined with normal use and wear. Uniroyal quotes from *Mullen v. General Motors Corp.*, 32 Ill.Dec. 122, 336 N.E.2d 338, 346 (1975), for the proposition that, while prolonged use is insufficient by itself to negate liability, "increased longevity must yield a progressively stronger inference that a given product—particularly a product such as an automobile tire—was not defective, but failed from extrinsic causes," and may have made this argument to the jury (opening and closing arguments, however, were not transcribed). But it did not offer a proposed instruction to this effect, and cannot now contend that the instructions foreclosed the jury from finding in its favor on the basis that, while it failed to prove that the tire had been operated in an underinflated condition, plaintiffs failed to prove the existence of a manufacturing defect.

**3.** *Cf. Graham v. Ryerson*, 96 Mich.App. 480, 292 N.W.2d 704 (1980). In *Graham*, plaintiff sought damages for injuries caused by the explosion of a truck wheel assembly, alleging defective design and failure to warn of the hazards of the assembly. The manufacturer defended on the grounds that it had no duty to warn since plaintiff was an "expert" in changing truck tires.

The trial court agreed, and refused to instruct the jury on the duty to warn issue. The appellate court rejected a general rule eliminating a duty to warn "experts." It also distinguished between dangers that are open and obvious, *e.g.* the danger of fire or explosion by the careless use of gasoline, and latent dangers that may be within the knowledge of specific individuals or classes of individuals. The court also concluded that the allegedly unsafe practice leading to plaintiff's injury, inflating flat tires in order to elevate the vehicle, was known to the manufacturer since it had been informed of numerous similar blowout accidents. Similarly, we conclude that the jury could find that Uniroyal knew that tires were run underinflated in view of Harrison's testimony. Although the *Graham* court, in reversing the trial court, held that "[a]lthough the question of duty is generally for determination by the trial court as a matter of law, the jury should examine the issue pursuant to proper instructions, when the facts adduced at trial are in dispute, giving rise to a reasonable difference of opinion as to the foreseeability of the particular risk and the reasonableness of defendant's conduct in that regard," 96 Mich. App. at 488, 292 N.W.2d at 707–08, this holding does not relieve the defendant of its burden of introducing evidence sufficient to raise the issue of excuse.

pertaining to the knowledge of professional truck drivers with respect to maintaining proper tire pressure or the dangers of underinflation,[4] nor is the cited testimony by Bruce Love sufficient to support defendant's theory. *See* note 1 *supra*. While it is true that the defendant is entitled to an instruction presenting its theory of the case, it is only entitled to such an instruction if there is some evidence to sustain it. *Farrington Motors, Inc. v. Fidelity & Casualty Co. of New York*, 303 S.W.2d 319, 321 (Ky.1957); *accord General Motors Corp. v. Walden*, 406 F.2d 606 (10th Cir. 1969). In the absence of competent evidence, presentation of Uniroyal's proffered instruction would invite the jury to make a speculative and uninformed judgment about what it believes the typical "professional truck driver" should know.[5] Consequently, the trial court did not err in refusing to instruct the jury that Uniroyal did not have a duty to warn about the danger of a blowout if such danger is generally known or recognized by truck drivers.

## III.

■ The remainder of appellant's allegations of error are without merit. With respect to the sufficiency of the evidence of manufacturing defect, although there were weaknesses in the testimony of plaintiffs' experts, there were weaknesses in the countering evidence presented by Uniroyal as well. In particular, the wear pattern of the tire, which admittedly indicated prolonged operation in an overinflated condi-

tion, and the fact that the unusual durometer readings obtained by Cunningham allegedly were confirmed by Cerny independently, support plaintiffs' theory.[6] Unlike the *Mullen* case cited by the defendant, in which the court held that inconsistencies in the testimony of plaintiff's expert, coupled with rebuttal testimony of defendant's experts, completely negated the probativeness of plaintiff's expert's testimony, 336 N.E.2d at 347, the instant case presents a typical "battle of the experts." *See, e.g., Gisriel*, 517 F.2d at 702; *Firestone Tire & Rubber Co. v. Pinyan*, 155 Ga.App. 343, 270 S.E.2d 883, 887–88 (1980); *Rome*, 234 S.E.2d at 280. Moreover, the propriety of admitting expert testimony in a federal trial is governed by federal law, which narrowly limits an appellate court's authority to second guess trial courts on questions of admissibility of expert testimony. *Edwards v. Sears, Roebuck & Co.*, 512 F.2d 276, 292 (5th Cir.1975). While the defendant brought out weaknesses in the qualifications of plaintiffs' experts and technical errors in their testimony, these were not sufficient to disqualify them from testifying and reflect on the weight of the evidence or the credibility of the witness rather than the admissibility of the testimony itself.

Uniroyal sought to introduce into evidence four rubber plugs manufactured during the course of trial for the purpose of discrediting the testimony of plaintiffs' experts. Two of these were cured to provide durometer hardness readings of 39, one more than the highest reading obtained on

4. When questioned on this point at oral argument, Uniroyal's counsel, in addition to Love's testimony, suggested that a booklet distributed by the Rubber Manufacturers Association (RMA) that was introduced at trial was indicative of the knowledge of truck drivers. The trial court, however, effectively rejected just this contention in sustaining plaintiffs' objection to introduction of the booklet to prove that the tread depth of the tire in question was inadequate at the time of the blowout, because Uniroyal had failed to present evidence charging the users with knowledge of the RMA booklet.

5. Moreover, the jury was instructed that liability for failure to warn could only be imposed if it

found that such failure was a substantial factor in causing plaintiffs' injuries. If the jury concluded that underinflation was the cause of the blowout, Uniroyal's failure to warn would not be a substantial factor if the jury believed that plaintiffs knew or should have known to maintain proper tire pressure to avoid blowouts from underinflation.

6. It is also noteworthy that plaintiffs' experts' readings were uniformly low around the circumference of the serial side of the tire, but uniformly higher, reaching normal values, on the non-serial side. Such results are inconsistent with measurement error, although not, of course, with the possibility of falsification.

the serial side of the tire by plaintiffs' experts, and two to 65. Uniroyal argued that it did not learn until trial that those experts would testify that they obtained readings in the thirties, and that comparison of the difference in the plugs tended to show that it was more likely than not that plaintiffs' experts erred in the readings they took. The trial judge excluded the plugs as evidence on the ground that it was impossible to determine that the plugs were manufactured by the same method or of the same composition as the tire in question. In so ruling, the judge specifically noted that "Mr. Harrison had an ample opportunity to and did testify as I recall, that rubber having a consistency in the 30's on the duerometer [sic] were soft. He described it in great detail. That's one further fact that the Court considered in connection with its ruling."

■ Where a sample of an article or substance, the quality or condition of which is involved in litigation, is offered as evidence, there must be a showing that it is fairly representative of the whole and sufficient identification as to its source. *See Crown Cork & Seal Co. v. Morton Pharmaceuticals, Inc.*, 417 F.2d 921, 926 (6th Cir.1969); Annot., 95 A.L.R.2d 681 (1964). While the trial judge appears in part to have excluded the rubber plugs because such a showing was not and could not be made, we are in doubt respecting the logic of his ruling. Since the plugs were only offered as evidence of relative hardness, it may be that the only foundation that would have been necessary was testimony to the effect that rubber samples with identical

durometer readings of any composition, produced by any method of manufacture, would feel the same.[7] However, even if the trial judge erred in excluding the plugs, such error was harmless. They were offered essentially as a visual aid to the jury in comprehending the verbal testimony of defendant's expert witness. *See* 3 Jones on Evidence § 15:1, at 3 (S. Gard 6th ed. 1972). Any prejudice that Uniroyal may have suffered was insufficient to warrant overturning the jury's verdict.[8] "With respect to the erroneous exclusion of evidence in a jury trial, it has often been held that the exclusion is not prejudicial if other substantially equivalent evidence of the same facts has otherwise been admitted into evidence." *Crown Cork & Seal Co.*, 417 F.2d at 926–27 (citations omitted). "No error in the admission or exclusion of evidence is ground for reversal unless refusal to take such action appears to the Court to be inconsistent with substantial justice." *Prater v. Sears, Roebuck & Co.*, 372 F.2d 447, 448 (6th Cir.1967) (per curiam) (citations omitted).

■ Uniroyal's argument that "[i]f the basis for recovery under strict liability is inadequacy of warnings or instruction about dangers, then plaintiff would be required to show an adequate warning or instruction would have prevented the harm'" (quoting Keeton, *Products Liability*, 48 Tex.L.Rev. 398, 414 (1970)), at least in the sense that they quote it, is an incorrect statement of Kentucky law. In the *Post* case, the Kentucky Court of Appeals clearly held that in the absence of an adequate warning, the defendant cannot shift

7. We note, however, that the plugs were offered to demonstrate differences in consistency as well as hardness. One plug of each hardness was cut open, the soft plug being somewhat porous due to the presence of what defendant's expert described as "blow holes." For the samples to be admissible for this purpose, Uniroyal would have to establish that the manufacturing process of the tire in question would result in the same porousness if a tire were manufactured to a hardness of 39. Because records with respect to the manufacture of the tire in question were no longer available, Uniroyal could not establish that the consistency of the tire in question would have been the same as that of the plugs.

8. We note that plaintiffs' experts cited the unusually low durometer readings as supportive of rather than central to their conclusion that incomplete or improper vulcanization was the underlying cause of the blowout. Normal test results would not have contradicted their evaluation and the other facts on which it was based. Thus, proof that those experts erred in taking their readings would reflect on their credibility, but would not "thoroughly discredit" their testimony. *Cf. Mullen*, 336 N.E.2d at 347.

to the plaintiff the burden of proving that she would not have misused the product regardless. 437 S.W.2d at 521 ("It is no answer to say that appellant would have attached the machine to a 220 DC outlet anyway, since he did so in face of the directions which were furnished. Maybe he would have, but the facts at hand make that a question of conjecture."); *accord Wolfe*, 376 N.E.2d at 147.

■ Apart from its argument on underinflation, Uniroyal contended that Love and Leonard were contributorily negligent in not replacing the tire that blew out before beginning the trip in question. While it is true as Uniroyal contends that had the tire been replaced the accident in question would not have occurred, there was ample evidence that the internal ply separation (whatever its cause), which was the cause of the blowout, would not be apparent on visual inspection, and that whatever the tread wear at the center of the tire, such wear was unrelated to the blowout.[9] Plaintiffs' failure to replace the tire does not bar recovery.

■ Uniroyal argued to the trial court and to this court that since a negligence theory of recovery is completely superseded by the elements of strict liability, instruction on both theories unduly emphasized plaintiffs' view of the case to its prejudice. While prejudice may be presumed where there has been an erroneous instruction of law, Uniroyal has presented no authority extending this presumption to an instruction that is merely duplicative. To the extent that strict liability and negligence instructions overlapped in this instance, the repetition did not occur so often or so emphatically as to impugn the impartiality of the verdict. *See Fruehauf Trailer Division v. Thornton*, 174 Ind.App. 1, 366 N.E.2d 21, 26–28 (1977) (while implied warranty theory has been superseded by

strict liability, any error in instructing on both theories was harmless).

■ Uniroyal also contends that since plaintiffs' complaint and answer to Uniroyal's interrogatories only indicated that plaintiffs alleged that the tire failed due to a manufacturing defect, the court should not have allowed plaintiffs to raise the duty to warn and defective design issues. As a general matter, allegation of "defectiveness" under Kentucky's law of strict liability raises all such specific grounds. *See Montgomery Elevator Co. v. McCullough*, 676 S.W.2d 776, 780–81 (Ky.1984) ("Considerations such as feasibility of making a safer product, patency of the danger, warnings and instructions, subsequent maintenance and repair, misuse, and the products' inherently unsafe characteristics, while they have a bearing on the question as to whether the product was manufactured 'in a defective condition unreasonably dangerous,' are all factors bearing on the principal question rather than separate legal questions."). More specifically, once Uniroyal raised underinflation as a defense, it injected the issue of warnings and design into the case. *See Post*, 437 S.W.2d at 522 (approving jury instruction that if defendant should have foreseen misuse, it would have duty " '(a) To give such probable user warning of the danger arising from the use ..., or (b) In the absence of adequate warning, as set out in (a) hereof, to apply such technology as the jury may believe from the evidence was then available to the defendant ....' "). Although the evidence pertaining to underinflation warning devices was insufficient to raise the question of design defect,[10] since absence of adequate warnings may constitute defective design, *C & S Fuel, Inc. v. Clark Equipment Co.*, 552 F.Supp. 340, 347 (E.D.Ky.1982), it was not error to instruct the jury that a product is defective if, "as designed or manufactured, [it] cre-

---

**9.** For this reason, the District Court's exclusion of certain evidence pertaining to tread depth was not prejudicial.

**10.** However, it was relevant to Uniroyal's knowledge of the problem of operation of truck

tires while underinflated. We note that Uniroyal did not request that the jury be instructed that the relevance of the evidence was limited to this purpose only.

ated such a risk of injury that an ordinarily prudent company ... would not have put it on the market." We also note that Uniroyal did not ask that the instruction regarding design defect be limited to the failure to provide a warning, and that Uniroyal itself requested the language adopted by the court in Instruction 1 to define "defective condition, unreasonably dangerous," including the phrase "designed or manufactured."

The judgment of the District Court is affirmed.